[Cite as *State Farm Mut. Ins. Co. v. Jiles*, 2014-Ohio-2512.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE CO. et al. | C.A. No.    26841 |
| Appellees | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE STOW MUNICIPAL COURT COUNTY OF SUMMIT, OHIO CASE No.    2011 CVE 1234 |
| JOSHUA EVAN JILES, et al. | |
| Appellants | |

DECISION AND JOURNAL ENTRY

Dated: June 11, 2014

---

CARR, Presiding Judge.

{¶1}   Appellants, Joshua Jiles, a minor, and Donald Jiles, his father, appeal the judgment of the Stow Municipal Court.  This Court affirms in part, reverses in part, and remands.

I.

{¶2}   On December 4, 2010, then-17-year old Joshua Jiles left his father's home in Stow, and stole a dump truck.  Several officers from the Stow Police Department pursued the stolen truck.  Joshua refused to stop the truck and evaded the police from various jurisdictions over the course of a fifty-mile chase over municipal public roads and highways.  At times during the chase, Joshua drove the truck at speeds of 65 to 70 miles per hour.  He hit numerous other vehicles in the roadway, including both private vehicles and police cruisers, as he evaded the law enforcement.  As one police officer positioned his cruiser behind the dump truck, Joshua put the truck in reverse and struck the cruiser.  Joshua then continued to drive in reverse for almost two minutes down Fishcreek Road, in Stow, ultimately crashing through two private vehicles at the

intersection of Fishcreek and Graham Roads. After hitting the two cars, Joshua stopped the dump truck, allowing two other minors to exit the truck. Joshua then continued to lead the police on a high speed chase for close to an hour before being apprehended by police.

{¶3} Joshua hit and damaged the insured vehicles of Aaron Mehlberg (a Nissan) and Mark Pesich (a Toyota) at the Stow intersection. State Farm Mutual Automobile Insurance Company insured Mr. Mehlberg's vehicle, and filed a complaint against Joshua and Donald Jiles seeking damages for sums paid by both the insurance company and its insured arising out of the crash. State Farm sought judgment against Donald pursuant to R.C. 3109.09, under the theory that Donald was liable for the intentional acts of his son Joshua. State Farm sought damages in the amount of $7,008.04. Grange Mutual Casualty Company insured Mark Pesich's vehicle, and filed a complaint against Joshua and Donald Jiles for damages arising out of the same crash in the amount of $7,835.69. Grange also sought judgment against Donald pursuant to R.C. 3109.09. State Farm and Grange, as subrogated insurers, had standing to properly maintain these actions against Donald. *Motorists Mut. Ins. Co. v. Bill*, 56 Ohio St.2d 258 (1978), paragraph two of the syllabus. The State Farm and Grange cases were consolidated by the trial court.

{¶4} These matters proceeded to trial before the bench. The trial court issued a judgment in favor of State Farm and Grange in the respective amounts requested. The court based its judgment on findings that Joshua's collisions with the Nissan and Toyota were willful and intentional, that Donald qualified as Joshua's parent for purposes of R.C. 3109.09, and that the statute allows for every plaintiff to collect up to $10,000.00 for damages even when the property of multiple plaintiffs is damaged during the course of one incident. Donald and Joshua (hereinafter collectively "Jiles") filed a timely appeal in which they raise two assignments of error for review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED AS A MATTER OF LAW BY FINDING THAT THE AUTOMOBILE ACCIDENT CAUSED BY JOSHUA JILES WAS AN INTENTIONAL ACT AND CONSTITUTES A WILLFUL DAMAGE TO PROPERTY AS THAT TERM HAS BEEN DEFINED IN R.C. 3109.09(B).

{¶5} Jiles argues that the trial court erred as a matter of law in finding that Joshua willfully damaged the Nissan and Toyota vehicles, because the court misinterpreted and misapplied the statutory meaning of that phrase. This Court disagrees.

{¶6} This Court reviews the interpretation and application of a statute de novo. *Akron v. Frazier*, 142 Ohio App.3d 718, 721 (9th Dist.2001). The reviewing court will not defer to the trial court's interpretation and application; rather, we must construe the statute according to the legislative intent as determined by the statute's language. *Id*.

{¶7} R.C. 3109.09 allows parents to be held financially liable for certain acts committed by their children. R.C. 3109.09(B) provides in relevant part: "Any owner of property * * * may maintain a civil action to recover compensatory damages not exceeding ten thousand dollars and court costs from the parent of a minor if the minor willfully damages property belonging to the owner * * *." Jiles argues that the trial court misinterpreted and misapplied the phrase "willfully damages property" as that phrase has been otherwise interpreted and applied by Ohio courts. Specifically, Jiles argues that the municipal court's application is contrary to that recognized by the Ohio Supreme Court in *Motorists Mut. Ins. Co. v. Bill*, 56 Ohio St.2d 258 (1978), and this Court in *Allstate Ins. Co. v. Jaeger*, 9th Dist. Lorain No. 09CA009591, 2009-Ohio-5756.

{¶8} The *Bill* court construed for the first time the meaning of the statutory phrase "willfully damages property" after reviewing the language of the statute, as well as secondary

sources discussing the purposes and purported legislative intent of similar statutes in other jurisdictions. The Ohio Supreme Court surmised that the Ohio General Assembly had a dual purpose in enacting R.C. 3109.09, that is, both to provide a means by which the injured party might receive some compensation for the damaged property and to incentivize parents to supervise and guide their children so as to avoid the imposition of a statutory penalty for the destructive acts of those children. *Bill*, 56 Ohio St.2d at 263. The high court opined that, because the statute was enacted in derogation of the common law which did not hold parents liable for the tortious acts of their children, parental liability must be construed in a strict, rather than a liberal, manner. *Id*. The court first held that the term "willfully" in this context equates with the term "intentionally." *Id.* at 265. Thereafter, the *Bill* court devised a two-part analysis for determining parental liability pursuant to R.C. 3109.09(B). First, the child must have intentionally done the act which gave rise to the damage. *Id.* at 266. Second, the child must have intended or acted with purpose to cause such damage. *Id*. The high court reasoned that "this dual finding is necessary under this statute, in that the intentional doing of an act does not necessarily make the unintentional damage it produces, willful or intentional." *Id*.

{¶9} The facts in *Bill* were as follows. A sixteen-year old (Bill) was driving three companions at 4:00 a.m., when an officer who desired to check the driver's license turned on his flashing lights and pulled the car over to the curb. Bill pulled over but immediately pulled away, causing the officer to give chase. Bill drove as fast as 75 m.p.h., running red lights and stop signs for one-and-a-half miles purely in an attempt to evade police until he collided with another vehicle on the side of the road. Applying that two-part analysis to the facts, the *Bill* court concluded that, while Bill was driving in a wanton and reckless manner, he was not driving with

the intent to cause damage to the parked car. *Bill*, 56 Ohio St.2d at 266. Accordingly, the parents could not be held liable pursuant to R.C. 3109.09(B) under these circumstances.

{¶10} In *Jaeger, supra*, this Court adopted the two-part analysis pronounced in *Bill*. 2009-Ohio-5756, at ¶ 6. We affirmed the trial court's judgment granting summary judgment to the child's mother because (1) the insurance company did not allege any operative facts in its complaint that the child acted intentionally or willfully; rather, it alleged that the child negligently operated the car; (2) the insurance company did not reference any Civ.R. 56(C) evidence in its brief in opposition to the mother's motion for summary judgment; and (3) the parties agreed that the child lost control of the car and negligently caused damage to a garage and a fence. *Id.* at ¶ 8-10. Reviewing the facts in the light most favorable to the insurance company, we concluded that there was no genuine issue of material fact as to the second prong of the *Bill* analysis, as the parties agreed that the child negligently damaged the property. *Id*.

{¶11} This Court concludes that the trial court in this case applied the two-part analysis enunciated in *Bill* and adopted by us in *Jaeger*. In fact, after reviewing the facts, the trial court expressly found that "not only was the initial act of stealing the dump truck intentional, so was Joshua Jiles' collision with both of Plaintiffs' vehicles." This finding corresponds precisely with the meaning of the statutory phrase "willfully damages property" as construed by both the Ohio Supreme Court and this Court. Accordingly, the trial court did not err in its interpretation of R.C. 3109.09(B).

{¶12} Jiles nevertheless argues that the trial court misapplied the statute to the specific facts of this case, because the *Bill* court reached the opposite conclusion based on "nearly indistinguishable" facts. This Court disagrees.

{¶13} Again, the facts in *Bill* indicated that a sixteen-year old driver fled in a car after initially pulling over for the police. Bill drove at a high rate of speed while trying to evade the police, until he crashed into a parked car approximately one-and-a-half miles away. The crash and subsequent damage to the parked car were an accident that occurred as Bill sought only to evade the police. The facts in the instant case are distinguishable.

{¶14} Here, Joshua stole a dump truck, a large, heavy vehicle. He was aware that the police were attempting to stop him. While there is no doubt that Joshua was trying to evade the police, he behaved proactively to thwart his capture. The video footage from various police cruisers taken during the chase showed Joshua's capable maneuvering of the truck. When one officer attempted to pass him in order to force the truck to slow and stop, Joshua swerved at the police cruiser. After the cruiser finally passed him, Joshua slowed the truck somewhat and ran into the cruiser, pushing it out of his way. Officer Steven Miller of the Stow police department testified that he was following the truck at the time. He testified that he saw Joshua look at him through his side mirrors, put the truck in reverse, and ram the truck into the officer's cruiser, spinning in around and pushing it out of the way.

{¶15} Joshua continued to competently drive the truck in reverse along Fishcreek Road for some distance. Officer Miller testified that he saw Joshua using his side mirrors to facilitate his travel. As Joshua approached the intersection of Fishcreek and Graham Roads, there were civilian vehicles stopped at the intersection, blocking the truck's path. The video of the scene showed Joshua backing into them to push them out of the way. Officer Miller testified that, based on the location of the side mirrors on the truck, Joshua would have been able to see the two cars he struck at the intersection. Joshua then stopped the truck and let two juveniles out of

the cab. Once the juveniles cleared the truck, Joshua immediately put the truck in a forward gear and sped away down Graham Road as the police continued to give chase.

{¶16} Officer Miller testified that, based on his observations, Joshua knew how to drive the dump truck. Sergeant Steven Dunton of the Stow police department also took part in the chase and testified that Joshua appeared to have control of the dump truck. Sgt. Dunton was able to ultimately maneuver his police SUV around Joshua on Fishcreek Road. The sergeant slowed his vehicle to try to get Joshua to stop, but Joshua hit the SUV and continued to push it 30-40 feet before stopping and putting the truck in reverse and beginning his backwards trek into Officer Miller's cruiser and continuing to the intersection of Fishcreek and Graham. Sgt. Dunton also witnessed Joshua swerve towards another officer's cruiser, later hit the two civilian vehicles at issue in this case as they sat in the line of traffic, swerve toward the pedestrian island and let two juveniles out of the truck, then shift into a forward gear and maneuver around the island to begin traveling on Graham Road. The sergeant testified that, based on his observations, Joshua appeared to be in control of the dump truck at all times, even while driving backwards and after he collided with and pushed the civilian vehicles out of his way at the intersection.

{¶17} Sergeant Brian Snavely of the Stow police department joined the chase and pursued Joshua for approximately 50 minutes. He observed Joshua's driving upon the municipal roadways, as well as on the highway. Sgt. Snavely testified that he saw Joshua ram a civilian vehicle (not a subject vehicle in this case) and push it out of the way to allow him to continue driving on the roadway. He further observed Joshua swerve at numerous police cruisers and civilian vehicles on the highway to facilitate his escape, and swerve to avoid six attempts by the police to stop the truck with stop sticks (spike stripping). He testified that he was aware of a seventh time that Joshua successfully swerved to avoid a stop stick but he did not witness that.

Joshua passed hundreds to thousands of vehicles over 50 miles on the highway, occasionally throwing objects like bricks, a fire extinguisher, and a tarp from the truck, all without losing any control over the vehicle or hitting other vehicles on the highway while driving between 65 and 70 m.p.h. Sgt. Snavely testified that, based on his observations, Joshua handled the dump truck very well, taking deliberate actions and demonstrating an exceptional level of maneuverability. Upon later questioning, Joshua admitted that he was a farm boy who could drive anything with wheels. He further admitted that he knew the dump truck had 16 gears, and he used every one of them at some time during the hour-long chase. He further admitted that he drove the truck 70 m.p.h. because it would not go any faster.

{¶18} Although Joshua told the police that he had been drinking, every officer who testified that he had contact with the juvenile also testified that there was nothing to indicate that Joshua was under the influence. In addition, although Donald testified that he smelled alcohol on Joshua's breath when he left home that morning, police officers testified that they did not smell any alcohol emanating from the youth.

{¶19} Unlike the circumstances in *Bill*, the facts in this case support a finding by the trial court that Joshua did not accidentally hit the Nissan and Toyota at the intersection of Fishcreek and Graham Roads as he attempted to flee the police. Instead, Joshua demonstrated a high level of competence in controlling the dump truck throughout the entire chase, stopping only after he failed to avoid an eighth deployment of stop sticks and one of the truck's tires deflated. His maneuvering of the dump truck was deliberate and calculated to push vehicles out of his way in order to continue his flight. Accordingly, the trial court properly applied the law when it found that, based on the facts, Joshua willfully damaged the Nissan and Toyota. The first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED AS A MATTER OF LAW BY HOLDING DONALD JILES RESPONSIBLE FOR THE CONDUCT OF THE MINOR CHILD IN EXCESS OF THE $10,000.00 MAXIMUM AMOUNT AUTHORIZED IN R.C. 3109.09.

{¶20} Jiles argues that the trial court erred by imposing liability on Donald in a total amount that exceeded $10,000.00 after concluding that every plaintiff with a statutory claim against the parent, and arising out of the same incident, may recover compensatory damages up to the $10,000.00 limit. This Court agrees.

{¶21} As noted above, this Court's review of the trial court's interpretation and application of a statute is de novo. *Frazier*, 142 Ohio App.3d at 721. We reiterate the relevant portion of R.C. 3109.09(B): "Any owner of property * * * may maintain a civil action to recover compensatory damages not exceeding ten thousand dollars and court costs from the parent of a minor if the minor willfully damages property belonging to the owner * * *."

{¶22} Neither party cites, nor has this Court found, any cases in Ohio which have addressed the issue of the extent of the recovery of compensatory damages by multiple parties arising out of a single incident or series of events within an ongoing occurrence where the separate parties' combined damages exceed $10,000. In other words, whether multiple parties may each recover up to the statutory maximum or whether the total recovery from a parent for all damages may not exceed the statutory maximum is an issue of first impression in the state. Nevertheless, the Ohio Supreme Court has provided some guidance from which we can glean support for our conclusion that the trial court erred by awarding compensatory damages to State Farm and Grange because the limit on Donald's statutory liability had already been met with regard to damages sustained by the owner of the dump truck.

{¶23} In *Bill, supra*, the Ohio Supreme Court acknowledged that there is no legislative history available regarding the purpose behind the enactment of the parental liability statute. 56 Ohio St.2d at 262. Despite the legislature's amendment of R.C. 3109.09 to periodically raise the cap on the amount of liability to which a parent may be subjected, the high court nevertheless concluded, based on an analysis of the purposes behind similar legislation in other states, that the legislature did not enact the provision purely as a means of providing compensation to injured parties. Instead, the *Bill* court wrote:

> It is reasonable to assume that the General Assembly had a companion purpose for the passage of such legislation, and that could be the thought and desire of making parents more responsible for the behavior of their minor children, and to impose a form of penalty upon the parents of a destructive child.

*Id.* at 263. In addition, the high court emphasized that this statute was enacted in derogation of the common law which did not hold parents financially responsible for the torts of their children. *Id.* Therefore, the *Bill* court concluded that the purpose of R.C. 3109.09(B) is not primarily remedial, i.e., to provide compensation for injured parties, but rather equally serves as a means to compel parents to supervise and guide their children and to impose a penalty for their failure to do so. *Id.*

{¶24} The insurance companies cite *Rudnay v. Corbett*, 53 Ohio App.2d 311 (8th Dist.1977), for the proposition that an early amendment to R.C. 3109.09 to replace the phrase "actual damages" with "compensatory damages" indicates the legislative intent to compensate the injured party rather than punish parents. *Id.* at 314-315. The *Bill* court, however, subsequently expressly rejected the notion that the purpose of the parental liability statute was solely to compensate for injury. The limitation on the compensatory purpose of the statute is further evidenced by the maintenance of a cap on liability.

**{¶25}** Given the Ohio Supreme Court's recognition of the statutory purpose to incentivize parents to properly supervise and rear their children and penalize them to a limited extent if they do not, it would be manifestly unjust to subject them to unlimited liability for damages willfully caused to the property of multiple parties during a single rampage. Presumably, the hope is that the imposition of a penalty of up to $10,000 will cause parents to take more proactive steps in the future to instill in their child an understanding of the type of behavior expected in civilized society. Imposition of the maximum penalty multiple times over for a child's intentional harm arising out of a single ongoing course of conduct, with no opportunity by the parents to cure their earlier defective attempts at parenting, offers no incentive to do better. It merely subjects parents to the possibility of utter financial ruin and hopelessness. The legislature surely did not intend to make parents self-insurers for their children's actions to the point of bankruptcy.

**{¶26}** Moreover, the legislature clearly did not intend that R.C. 3109.09(B) would fully compensate any injured party for property damage caused by a child's willful conduct, or else it would not have included a cap on the parents' liability. On the other hand, the legislature clearly wanted to impress upon parents their obligation to raise and supervise their children in an appropriate manner. A $10,000 judgment carries the necessary sting to effect this purpose. Moreover, the statute clearly strives to compel parents to action as evidenced by the statute's provision that, when the injured party is a board of education, the board of education may agree to allow the parents to perform community service in lieu of making full payment of the judgment. R.C. 3109.09(C)(1). Such a penalty compels parents to recognize the significance of their role as parents and the harm caused by their dereliction of their duty.

**{¶27}** Under circumstances where a child has willfully damaged the property of multiple parties during an uninterrupted course of conduct, this Court concludes that parents remain subject to financial liability in the total cumulative amount of $10,000, rather than $10,000 for each party whose property was damaged. Such a result serves to compensate for damage up to a limited, finite degree as evidenced by the existence of a damages cap; and to penalize parents for failing to properly execute their parental responsibilities for the supervision and guidance of their children. While some injured parties, as in this case, may not receive any compensation at all for their damages, this Court cannot say that such a result is any more unfair than where a single plaintiff has suffered damages well in excess of the statutory maximum amount of liability, yet may only recover $10,000 from the child's parents. Such was the case here where damages to the dump truck exceeded $25,000.

**{¶28}** In this case, because Joshua's parents previously entered into a settlement agreement with the owner of the dump truck to pay statutory damages in the amount of $10,000 for damage to the truck, the limit of the parents' liability arising out of Joshua's willful conduct in this incident had been exhausted. The statute caps the liability of "the parent" at $10,000 and defines "parent" (as relevant to the facts of this case) as "[b]oth parents." R.C. 3109.09(A)(1). As the statutory limit on parental liability was previously exhausted, the trial court erred by awarding any monetary damages to State Farm and Grange. The second assignment of error is sustained.

III.

**{¶29}** The first assignment of error is overruled. The second assignment of error is sustained. The judgment of the Stow Municipal Court is affirmed in part, reversed in part, and the cause remanded for further proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Stow Municipal Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
HENSAL, J.
CONCUR.


APPEARANCES:

KEVIN V. ROGERS, JR., Attorney at Law, for Appellants.

DREW D. PRICE, Attorney at Law, for Appellees.